1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Gretchen Freeman Cappio (*pro hac vice*)
gcappio@kellerrohrback.com
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Telephone: (206) 623-1900
Fax: (206) 623-3384

*Counsel for Plaintiff City of Lorain, Ohio*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CITY OF LORAIN, OHIO,

                         Plaintiff,

     v.

HYUNDAI MOTOR COMPANY,
HYUNDAI MOTOR AMERICA, KIA
CORPORATION, and KIA AMERICA,
INC.,

                     Defendants.

No. 8:23-cv-02083-JVS-KES

AMENDED COMPLAINT

JURY TRIAL DEMANDED

TABLE OF CONTENTS

I.    INTRODUCTION ....................................................................................1

II.   JURISDICTION AND VENUE.............................................................5

      A.    Subject Matter Jurisdiction ........................................................5

      B.    Personal Jurisdiction .................................................................5

            1.    HMC's and KC's Forum-Related Activities ...........................6

            2.    HMC's and KC's Control Over Their Respective
                  Subsidiaries........................................................................8

      C.    Venue .........................................................................................9

III.  PARTIES................................................................................................10

      A.    Plaintiff......................................................................................10

      B.    Defendants .................................................................................10

            1.    Hyundai Motor Company .....................................................10

            2.    Hyundai Motor America .......................................................10

            3.    Kia Corporation ...................................................................11

            4.    Kia America, Inc...................................................................11

IV.   THE KIA HYUNDAI THEFT WAVE ................................................12

      A.    Measures to Prevent Vehicle Thefts Have Existed for
            over a Century ...........................................................................12

      B.    Hyundai and Kia Deviated from the Industry Standard by
            Electing Not to Include Immobilizers or Other
            Reasonable Anti-Theft Technology in the Susceptible
            Vehicles.....................................................................................20

      C.    The Lack of Reasonable Anti-Theft Technology in Most
            Hyundai and Kia Vehicles Has Led to a Wave of Thefts ...............23

D.      Car Thefts Imperil Public Safety ....................................... 25

E.      Car Thefts Drain Public Resources and Frustrate Public
        Policy ................................................................................. 29

V.    THE CONTINUING PUBLIC NUISANCE AND
      DEFENDANTS' LATE, INSUFFICIENT RESPONSE ......................... 31

VI.   IMPACTS ON THE CITY OF LORAIN ................................................ 37

VII.  CAUSES OF ACTION ........................................................................ 40

COUNT ONE — COMMON LAW ABSOLUTE PUBLIC
      NUISANCE ................................................................................ 40

COUNT TWO — COMMON LAW QUALIFIED PUBLIC
      NUISANCE ................................................................................ 44

COUNT THREE — NEGLIGENCE ................................................ 48

VIII. PRAYER FOR RELIEF ........................................................ 52

IX.   DEMAND FOR JURY TRIAL ................................................ 53

# I.    INTRODUCTION

1.    There is an inextricable link between preventing vehicle theft and protecting public safety. Making sure cars are not sitting ducks that are simple to steal protects both property and the public by keeping dangerous drivers in stolen vehicles off the roads. Two car manufacturers made a business decision not to equip the vehicles they sell with reasonable anti-theft technology, leaving counties and cities across the nation to deal with massive public safety consequences. Despite taking some initial steps to discourage thefts, Defendants have been unable to abate the dangerous crime wave unleashed on communities nationwide—a crime wave that continues to this day.

2.    The days of "hotwiring" cars with nothing more than a screwdriver are largely over. In most recent car models, the ignition key emits a radio signal that prompts a computer in the car to disengage an immobilizer device and allows the car to start and move. But recent Hyundai and Kia models are a glaring exception.

3.    For most model years between 2011 and 2022, long after other carmakers adopted immobilizer technology that ensured car ignitions could not be started without their keys, Defendants Hyundai Motor Company ("HMC"), Hyundai Motor America ("HMA" and, with HMC, collectively "Hyundai"), Kia Corporation ("KC"), and Kia America, Inc. ("KA" and, with KC, collectively "Kia") intentionally ignored industry-standard practices in the name of profit. Specifically, upon information and belief, at all relevant times, Defendants designed, manufactured, and distributed the following automobile models without engine immobilizers or other reasonable anti-theft technology: Hyundai Accent,

Elantra, Elantra GT, Elantra Coupe, Elantra Touring, Genesis Coupe, Kona, Palisade, Santa Fe, Santa Fe Sport, Santa Fe XL, Sonata, Tucson, Veloster, Venue, and Veracruz; and the Kia Forte, K5, Optima, Rio, Sedona, Seltos, Sorento, Soul, and Sportage. These vehicles, when manufactured and sold without engine immobilizers or other reasonable anti-theft technology, are referred to hereinafter as the "Susceptible Vehicles."

4.     As a result, online videos demonstrate how easy it is to steal Hyundai and Kia vehicles. In many cases, thieves use tools no more advanced than a USB cable. Hyundai's and Kia's business decisions to reduce costs, and thereby boost profits, by choosing not to equip their vehicles with immobilizers or other reasonable anti-theft technology have resulted in a dangerous rash of thefts. This vehicular crime wave has had a significant impact on law enforcement operations, emergency services, and public safety, particularly for Lorain, Ohio ("Plaintiff" or the "City of Lorain").

5.     In the 1960s and 1970s, all that was needed for a successful vehicle heist was a little brute force (to crack open the ignition column) and a key-shaped object to start the car and drive off within seconds. Thanks to modern technology, this is no longer the case for most cars.

6.     Hyundai and Kia are unique among automobile manufacturers in failing to install engine immobilizers or other reasonable anti-theft technology in most of their cars. This is not because the technology is somehow beyond them—in fact, Hyundai and Kia vehicles sold in the European and Canadian markets incorporate vehicle immobilizers, because regulations there expressly require them.

2

In the United States, meanwhile, Hyundai and Kia have decided to trade public safety for profits.

7.    The difference between the proportion of Hyundai and Kia vehicle models with immobilizers compared to all other manufacturers is staggering: for the 2015 model year, for example, only **26%** of Hyundai and Kia vehicles in the United States were equipped with immobilizers, compared to **96%** of vehicles from all other manufacturers.[1]

8.    Hyundai and Kia are aware of the well-documented benefit of immobilizer technology in preventing thefts, as they opted to install engine immobilizers in their higher end models and in all of their 2023 vehicles.

9.    Hyundai's and Kia's decisions to put profits over public safety have had devastating consequences for Plaintiff and its residents. Defendants' failure to install industry-standard immobilization technology or other reasonable anti-theft measures in the Susceptible Vehicles, notwithstanding decades of academic literature and research supporting the deterrent effects of such technology, has opened the floodgates to vehicle theft, reckless driving, crime sprees, and endangered public safety.

10.    This epidemic started in Milwaukee and spread nationwide. By June 2021, the Milwaukee Police Department reported that the theft of Hyundai and Kia vehicles had increased by 2,500% since the previous year, with an average of 30

---

[1] *Hyundai and Kia theft losses*, 38 HLDI Bull. 28, 2 (Dec. 2021), https://www.iihs.org/media/0e14ba17-a3c2-4375-8e66-081df9101ed2/opm7QA/HLDI%20Research/Bulletins/hldi_bulletin_38-28.pdf.

cars being stolen per day.[2] This trend then spread nationwide, enabled by millions of Hyundai and Kia vehicles lacking immobilizers or other reasonable anti-theft technology. As explained below, the crime wave continues to this day in communities coast to coast—and those communities are left to pay the price.

11.    Vehicle theft is not only a property crime affecting vehicle owners, but it also constitutes a grave threat to public safety. Vehicle theft goes hand in hand with reckless driving, which in turn can result in injuries and/or death. It can result in increased violence, as many car owners are unlikely to part with their vehicles willingly. It also consumes law enforcement and emergency resources and deprives the public of safe streets and sidewalks.

12.    The skyrocketing rate of Kia and Hyundai vehicle thefts has drastically impacted city and police resources for Plaintiff. The City of Lorain's residents are subjected to increasingly dangerous conditions on their streets, as car thieves (many of them teenagers) are taking advantage of Hyundai's and Kia's failures and engaging in reckless driving, endangering Plaintiff's employees, residents, and property.

13.    Defendants' conduct has created a public nuisance that could have been avoided had they followed industry-wide standards and installed immobilizer devices or taken other reasonable measures to deter thefts of their vehicles.

---

[2] James Gilboy, *Why Milwaukee Might Sue Hyundai, Kia Over Stolen Car Epidemic*, TheDrive.com (Dec. 11, 2021, 11:15 AM), https://www.thedrive.com/news/43454/why-milwaukee-might-sue-hyundai-kia-over-stolen-car-epidemic.

14. Among other harms, Plaintiff has been forced to divert funds and risk officer and public safety to combat the growing burden caused by increased Hyundai and Kia vehicle thefts and their many associated dangers, including reckless driving.

## II.     JURISDICTION AND VENUE

### A.     Subject Matter Jurisdiction

15. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a), as the amount in controversy exceeds $75,000 and there is complete diversity between the parties. The City of Lorain is regarded as a citizen of the State of Ohio, for the purposes of diversity jurisdiction. *Bullard v. City of Cisco, Texas*, 290 U.S. 179, 187 (1933). Defendants HMA and KA are citizens of the State of California, where they are headquartered and incorporated. Defendants HMC and KC are both multinational automakers, headquartered in Seoul, South Korea.

### B.     Personal Jurisdiction

16. This Court has general personal jurisdiction over Defendants HMA and KA because they are incorporated and headquartered in the State of California. HMA and KA have transacted and done business in the State of California and in this judicial district.

17. As detailed below, this Court has specific jurisdiction over HMC and KC under the long-arm statute of California based on (1) their forum-related activities from which this case arises; (2) the forum-related activities of HMC's primary domestic subsidiary, HMA, which HMC substantially controls; and (3) the

forum-related activities of KC's primary domestic subsidiary, KA, which KC substantially controls.

### 1.    HMC's and KC's Forum-Related Activities

18.    HMC is a South Korea-based company, and its substantial activities directed at the United States give rise to and relate to Plaintiff's claims.

19.    In a recent complaint to enforce its trademark rights, HMC represented that it "currently designs, manufactures, markets, distributes, and sells a wide range of automobile and related automobile parts to over 190 countries throughout the world, including the United States, under the trademark 'Hyundai.' "[3]

20.    HMC and KC design, manufacture, market, distribute, and sell the Susceptible Vehicles under their registered trademarks "Hyundai" and "Kia," respectively. Between 2011 and 2022, when the Susceptible Vehicles were sold and distributed in Plaintiff's jurisdiction, HMC and KC purposefully availed themselves of the United States' legal protections by registering and maintaining registrations with the United States government for trademarks associated with their vehicles and parts, which HMC and KC used to identify and distinguish their respective vehicles and parts in the United States, this district, and Plaintiff's jurisdiction.

21.    HMC and KC purposefully availed themselves of markets in the United States, including in this district and Plaintiff's jurisdiction, as each company sells 500 thousand vehicles per year in this market through their respective domestic subsidiaries, HMA and KA.

---

[3] First Amended Complaint at 6, *Hyundai Motor Am., Inc. v. Midwest Indus. Supply Co.*, No. 2:17-cv-3010-JCM-GWF (D. Nev. Nov. 21, 2018), Dkt. No. 34.

22.    HMC and KC manufactured over eight million of the Susceptible Vehicles, which were delivered to HMA and KA for sale in the United States. Upon information and belief, HMC and KC manufactured the majority of the Susceptible Vehicles overseas in South Korea. However, HMC and KC segregated the Susceptible Vehicles intended for sale in the United States and shipped those vehicles to the United States with full knowledge and intent that HMA and KA would distribute them across the country.

23.    Rather than passively placing the Susceptible Vehicles into the stream of commerce, HMC and KC intentionally targeted the distribution of the Susceptible Vehicles into United States markets specifically, because engine immobilizers are not expressly required by law to sell the vehicles in this country.

24.    HMC and KC played instrumental roles in HMA's and KA's analysis and decision-making processes related to the design and/or manufacture of the Susceptible Vehicles without reasonable anti-theft technology, such as engine immobilizers.

25.    Upon information and belief, HMC and KC both were involved in monitoring vehicle thefts of the Susceptible Vehicles, as reported by their respective subsidiaries, HMA and KA.

26.    HMC and KC purposely availed themselves of markets in the United States by regularly submitting applications to the Environmental Protection Agency to obtain certification required for the sale of their vehicles in the United States.[4]

---

[4] *See, e.g.*, Letter from Hyundai America Technical Center to Director Linc Wehrly re: Request for GHG credit for High Efficiency Alternator Technology (June 10, 2019), https://www.epa.gov/sites/default/files/2019-07/documents/kmc-off-cycle-

### 2. HMC's and KC's Control Over Their Respective Subsidiaries

27.    HMC and KC exercise control over HMA and KA, respectively, through both formal and informal means.

28.    Upon information and belief, HMC and KC possess the power to appoint board members to HMA and KA, respectively, and both HMC and KC have exercised this power.

29.    HMC operates a "Global Command and Control Center" with "walls covered with television screens and computer monitors" that track "every operating line at 27 plants in the world, in real time, 24 hours a day, 365 days a year."[5]

30.    The production chief for a Hyundai plant in Alabama noted that if there is "a hiccup at any of those boards, headquarters wants to know what needs to be done about it—right now[.]"[6]

31.    Upon information and belief, KC representatives similarly monitor Kia's global operations from HMC's Global Command and Control Center.

---

ghg-credit-high-efficiency-alternator-2019-06-10.pdf (writing on behalf of KC, f/k/a Kia Motors Corporation); *see also* Letter from Hyundai America Technical Center to Director Linc Wehrly re: Request for GHG Off-Cycle Credit for HVAC Brushless Motor Technology in 2020 Model Year and later HMC vehicles (Dec. 15, 2020), https://www.epa.gov/system/files/documents/2022-09/hyundai-ghg-credit-pwm-hvac-blm-apl-2020-12-15.pdf.

[5] William J. Holstein, *Hyundai's Capabilities Play*, 70 Strategy & Bus. 62, 67–68 (Spring 2013), https://digitaledition.strategy-business.com/publication/?m=6320&i=145911&p=70&ver=html5.

[6] *Id.* at 68.

8

32.     Senior executives in South Korea for HMC and KC also regularly visit Hyundai and Kia plants and offices throughout the United States, including HMA's and KA's California headquarters, both of which are located in this district.

33.     The common executives for HMC and HMA frequently overlap. Jose Muñoz, for example, is the current Global Chief Operating Officer of HMC and serves as the President and CEO of HMA. Meanwhile, Brian Latouf serves as the Global Chief Safety Officer for HMC and serves as the Chief Safety Officer of HMA.

34.     KC and KA also share executive employees. SeongKyu (Sean) Yoo serves as President and CEO of KA, as well as Senior Managing Director of KC. Additionally, HMC and KC have overlapping management, with Eui-Sun Chung serving as the President of KC and the Executive Vice Chairman of HMC.

35.     Last, HMC and KC control the public name and brand of HMA and KA, respectively.

**C.     Venue**

36.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because Defendants transact substantial business in this district. Venue is also proper for HMA and KA because they are headquartered here, have research and development offices here, and a substantial part of the events/omissions giving rise to the claims occurred in this district.

# III.    PARTIES

## A.    Plaintiff

37.    Plaintiff, the City of Lorain, Ohio, is a municipal corporation organized under the laws of the State of Ohio. The City is located in Lorain County, Ohio.

38.    The City of Lorain is the third-largest city in the Greater Cleveland area and had a population of 65,211 residents as of the 2020 Census.[7]

## B.    Defendants

### 1.    Hyundai Motor Company

39.    Defendant Hyundai Motor Company is a multinational automaker headquartered in Seoul, South Korea. HMC, together with Defendants Kia Corporation, Kia America, Inc., and Hyundai Motor America, comprise the Hyundai Motor Group, which designs, manufactures, and distributes the Susceptible Vehicles referenced in this Complaint. HMC is the parent of Hyundai Motor America.

### 2.    Hyundai Motor America

40.    Defendant Hyundai Motor America is an automobile designer, manufacturer, distributor, and/or servicer of new motor vehicles under the Hyundai brand doing business within the United States. HMA is incorporated and headquartered in the State of California. HMA's principal place of business is located at 10550 Talbert Avenue, Fountain Valley, California. HMA distributes,

---

[7] *Quick Facts, Lorain city, Ohio*, U.S. Census Bureau, https://www.census.gov/quickfacts/fact/table/loraincityohio/PST045222 (last visited Apr. 30, 2024).

10

markets, leases, warrants, and oversees regulatory compliance and warranty claims for Hyundai-brand vehicles through a network of over 800 dealers throughout the United States from its headquarters in California. Defendant HMA engages in continuous and substantial business in California.

### 3.    Kia Corporation

41.    Defendant Kia Corporation is a multinational automaker headquartered in Seoul, South Korea. KC is the parent corporation of Kia America, Inc. As of December 31, 2017, Defendant KC's largest shareholder was HMC, which holds 33.88% of KC's stock.[8]

### 4.    Kia America, Inc.

42.    Defendant Kia America, Inc. is a manufacturer and distributor of new motor vehicles under the Kia brand and is incorporated and headquartered in the State of California. KA's principal place of business is located at 111 Peters Canyon Road, Irvine, California. KA distributes, markets, leases, warrants, and oversees regulatory compliance and warranty claims for Kia-brand vehicles through a network of over 700 dealers throughout the United States from its headquarters in California. Defendant KA engages in continuous and substantial business in California.

---

[8] *The Future: Kia Motors Annual Report 2017* at 11, Kia, https://worldwide.kia.com/int/company/ir/archive/annual-report/download/B200002757/F200012579 (last visited Apr. 30, 2024).

## IV.    THE KIA HYUNDAI THEFT WAVE

### A.    Measures to Prevent Vehicle Thefts Have Existed for over a Century

43.    Since the invention of gasoline-powered automobiles at the close of the nineteenth century, consumers have needed effective ways to keep their vehicles from being stolen. Thus, efforts to prevent theft or unauthorized access to automobiles have tracked vehicle development. In 1919, St. George Evans and Edward B. Birkenbeuel invented the first electric immobilizer/vehicle security system.[9]

44.    Labeled the "Automobile-Theft Preventer" the purpose of Evans and Birkenbeuel's invention was relatively straightforward: "to provide a means for automatically signaling an attempt to move an automobile by unauthorized persons; and to provide a means for locking the electric circuit open, in which case it will be impossible to move the car by its own power."[10]

45.    Evans and Birkenbeuel's immobilizer/alarm system consisted of a three-by-three switch panel that connected to the car's battery, horn, and ignition. Upon exiting a vehicle, a driver could turn a few switches on the panel to different positions that, until released, would divert electricity to the horn instead of the ignition should an unauthorized user attempt to start the vehicle.

---

[9] U.S. Patent No. 1,300,150 (issued Apr. 8, 1919).
[10] *Id.* at col. 1 ll. 14–20.

ST. GEORGE EVANS & E. B. BIRKENBEUEL.
AUTOMOBILE THEFT PREVENTER.
APPLICATION FILED MAR. 5, 1918.

1,300,150.                                    Patented Apr. 8, 1919.

**Sketches for Evans & Birkenbeuel's "Automobile Theft Preventer"[11]**

46.     The timing of the first immobilizer patent coincided with Congress's enactment of the National Motor Vehicle Theft Act, 18 U.S.C. § 2311 *et seq.*, which made the interstate transportation of stolen vehicles a federal crime. The law passed, in part, to respond to the growing number of automobile thefts around the country, especially in midwestern cities.

47.     As time passed and technology advanced, the United States pursued further efforts to promulgate vehicle safety standards. These efforts were also fueled by the post-war rise in vehicle thefts among juveniles and young adults, "who took cars for joyriding and transportation."[12]

---

[11] *Id.* at figs. 1, 2, 3, 4.

[12] Anthony Dixon & Graham Farrell, *Age-period-cohort effects in half a century of motor vehicle theft in the United States*, 9 Crime Sci. 17, 1, 3 (2020),

13

48.    In 1966, Congress passed the National Traffic and Motor Vehicle Safety Act (the "Safety Act"), with the aim of administering new motor vehicle and traffic safety standards.[13] Administration of the Safety Act was overseen by the newly created Department of Transportation through its sub-agency: the National Highway Traffic Safety Administration, f/k/a/ the National Traffic Safety Bureau ("NHTSA").

49.    Pursuant to its statutory authority under the Safety Act, NHTSA promulgated numerous federal motor vehicle safety standards ("FMVSS"). Among these standards, FMVSS 114[14] requires minimum theft-protection standards for nearly all passenger vehicles in the United States:

> S1. Scope. This standard specifies vehicle performance requirements intended to reduce the incident of crashes resulting from theft and accidental rollaway of motor vehicles.
>
> S2. Purpose. The purpose of this standard is to decrease the likelihood that a vehicle is stolen, or accidentally set in motion.
>
> S3. Application. This standard applies to all passenger cars, and to trucks and multipurpose passenger vehicles with GVWR of 4,536 kilograms (10,000 pounds) or less.
> . . .
> S5.1 Theft Protection.

https://crimesciencejournal.biomedcentral.com/articles/10.1186/s40163-020-00126-5.

[13] National Traffic and Motor Vehicle Safety Act, Pub. L. 89–563, 80 Stat. 718 (1966).

[14] Standard No. 114; Theft protection and rollaway prevention, 49 C.F.R. § 571.114 (2010) ("FMVSS 114").

14

> S5.1.1 Each vehicle must have a starting system which, whenever the key is removed from the starting system prevents:
>
> (a)   The normal activation of the vehicle's engine or motor; and
>
> (b)   Either steering, or forward self-mobility, of the vehicle, or both.
>
> . . .
>
> S5.2.2 Except as specified in S5.2.4, the vehicle must be designed such that the transmission or gear selection control cannot move from the "park" position, unless the key is in the starting system.[15]

50.    The main motivation for creating FMVSS 114 was NHTSA's recognition "that stolen cars constitute a major hazard to life and limb on the highways. The evidence shows that cars operated by unauthorized persons are far more likely to cause unreasonable risk of accident, personal injury, and death than those which are driven by authorized individuals."[16]

51.    As early as 1966, studies showed "there were an estimated 94,000 stolen cars involved in accidents"—with "18,000 of these accidents result[ing] in injury to one or more people."[17] Accordingly, NHTSA recognized that "a reduction of the incidence of auto theft would make a substantial contribution to motor vehicle safety" and "protect the many innocent members of the public who are killed and injured by stolen cars each year."[18] To address this safety risk, which is largely tied

---

[15] *Id.*

[16] Motor Vehicle Safety Standard No. 114; Theft Protection; Passenger Cars, 33 Fed. Reg. 83, 6,471 (Apr. 27, 1968), https://www.govinfo.gov/content/pkg/FR-1968-04-27/pdf/FR-1968-04-27.pdf#page=1.

[17] *Id.*

[18] *Id.*

15

to "car thieves who could bypass the ignition lock . . . the agency decided to require a device, which would prevent either self-mobility or steering even if the ignition lock were bypassed."[19]

52.    An industry-standard engine immobilizer is an effective way to satisfy this requirement, "because it locks out the engine control module if an attempt is made to start the vehicle without the correct key or to bypass the electronic ignition system."[20] Defendants' choice not to use this industry-standard anti-theft technology or other reasonable anti-theft measures predictably led to rampant car thefts and resulted in a threat to public safety and an ongoing public nuisance.

53.    In the late 1980s and early 1990s, vehicle theft increased dramatically in the United States.[21] The most common method for stealing a car involved bypassing the motor's ignition switch, otherwise known as "hotwiring." The graph below illustrates the dramatic rise in car thefts during this time period.[22]

---

[19] Federal Motor Vehicle Safety Standards; Theft Protection, 71 Fed. Reg. 17,753 (Apr. 7, 2006), https://www.govinfo.gov/content/pkg/FR-2006-04-07/pdf/06-3358.pdf; *see also* Motor Vehicle Safety Standard No. 114; Theft Protection; Passenger Cars, 33 Fed. Reg. 83, 6,471 (Apr. 27, 1968), https://www.govinfo.gov/content/pkg/FR-1968-04-27/pdf/FR-1968-04-27.pdf#page=1.

[20] Jacqueline Glassman, *Interpretation ID : GF005229-2*, NHTSA (Sept. 24, 2004), https://www.nhtsa.gov/interpretations/gf005229-2#:~:text=This%20responds%20to%20your%20letter,114%2C%20Theft%20Protection.

[21] Anthony Dixon & Graham Farrell, *Age-period-cohort effects in half a century of motor vehicle theft in the United States*, 9 Crime Sci. 17, 1, 3 (2020), https://crimesciencejournal.biomedcentral.com/articles/10.1186/s40163-020-00126-5.

[22] *Id.* at fig. 1.

16



**Vehicle thefts per 10,000 vehicles in operation, and vehicle theft arrests per 100,000 population, 1960-2014**

54.   In a precursor to the contemporary crisis, in the late 1980's to early 1990's, General Motors cars were stolen at elevated rates due to the relative ease with which a thief could bypass the ignition lock.[23] The ease with which those cars could be stolen spurred a trend of youths—some as young as ten years old—engaging in automobile theft and joyriding.[24]

55.   In the years that followed, General Motors, and nearly all other automotive manufacturers, adopted the anti-theft technology of passive vehicle immobilizers for cars distributed to the American market, which were patented in 1993.[25] Unlike Evans and Birkenbeuel's invention nearly 75 years prior, the vehicle

---

[23] *See* Tim Farley, *Thieves Put GM Models at Top of List*, Oklahoman (Sept. 11, 1988, 12:00 AM), https://www.oklahoman.com/story/news/1988/09/11/thieves-put-gm-models-at-top-of-list/62639884007/.

[24] *See* Stephen Buckley, *D.C. Police Report Increase in Car Thefts by Youngsters,* Wash. Post (Feb. 1, 1990).

[25] Int'l Patent Publication No. WO 93/13968 (filed Jan. 7, 1993).

immobilizer would render the engine operable only "if the correct key having coded information is used[,]" rather than relying on concealed switches or memorizing keypad combinations.[26]

56.     In essence, the vehicle immobilizers of the 1990s worked by checking the "fingerprint" of a car key based on electronic codes the key sends to the vehicle. They prevented hotwiring by ensuring that a car would not start if the key was not present—whether or not the ignition switch was turned or bypassed.

57.     Although the mechanism behind the vehicle immobilizer was more intricate than the original 1919 invention, the overall purpose remained the same: "to make the vehicle more difficult to steal."[27]

58.     The invention proved successful and, less than five years later, the European Union mandated that all new passenger cars from 1998 onward be equipped with an electronic engine immobilizer.[28] Similar mandates soon followed in Australia, New Zealand, and Canada.

59.     As engine immobilizers became the industry standard among manufacturers, at least one study in the Netherlands suggested that immobilizers "lowered the overall rate of car theft on average by about 40 percent during 1995-2008."[29]

---

[26] *Id.*

[27] *Id.*

[28] Commission Directive 95/56/EC, 1995 O.J. (L286) 1 (amending Council Directive 74/61/EEC to require the installation of immobilizers and alarm systems in motor vehicles beginning in October 1998).

[29] Jan C. van Ours & Ben Vollaard, *The Engine Immobiliser: A Non-Starter for Car Thieves*, TILEC Discussion Paper No. 2013-001, SSRN (Jan. 14, 2013), https://deliverypdf.ssrn.com/delivery.php?ID=12708712009702911907808410700

60.    By 2011, studies concluded "that good quality electronic immobilizers [have] bec[o]me car theft's killer technology" and proved to be 32.7% "more effective in reducing car theft than alarms" and 42.2% "more effective than central locking."[30]

61.    Equally critical, academic studies support the proposition that "[f]rom the early 1990s onwards, it gradually became less easy for adolescents to begin offending as an increasing proportion of vehicles became secure" because the "young offenders did not have the skill or experience to overcome the new vehicle security technology, particularly electronic immobilizers."[31] As the rate of young offenders decreased due to improved vehicle security, "fewer adolescents" went on to experience "criminal career onset and continuance."[32]

---

8100103002204101703102707809909302410600907512711800203000112100512204212610702708709510002601807004603401306408807602206708511002001005806603809008501901710808903112706911108611312109603000102706909009000710608107803008&EXT=pdf&INDEX=TRUE.

[30] Graham Farrell *et al.*, *The Crime Drop and the Security Hypothesis*, 48(2) J. Res. Crime & Delinq. 147, 163, 169 (2011), https://www.researchgate.net/profile/Graham-Farrell/publication/255589010_The_Crime_Drop_and_the_Security_Hypothesis/links/54f3b8300cf299c8d9e537d9/The-Crime-Drop-and-the-Security-Hypothesis.pdf.

[31] Anthony Dixon & Graham Farrell, *Age-period-cohort effects in half a century of motor vehicle theft in the United States*, 9 Crime Sci. 17, 1, 7 (2020), https://crimesciencejournal.biomedcentral.com/articles/10.1186/s40163-020-00126-5.

[32] *Id.*; *see also* Graham Farrell, *Forty years of declining burglary in the United States: Explanation and evidence relating to the security hypothesis*, 35 Sec. J. 444, 458 (2022) https://link.springer.com/article/10.1057/s41284-021-00284-4 (arguing that "making crime more difficult to commit may be the most effective way to reduce juvenile crime and progression to adult crime").

**B.**    **Hyundai and Kia Deviated from the Industry Standard by Electing Not to Include Immobilizers or Other Reasonable Anti-Theft Technology in the Susceptible Vehicles**

62.    Studies by the Highway Loss Data Institute ("HLDI") showed "that vehicle theft losses decreased significantly after factory-installed passive immobilizing antitheft devices were introduced."[33] Specifically, HLDI studies between 1996 and 2013 all showed decreases in theft losses for vehicles with engine immobilizers studied in those years, including General Motors, BMW, Ford, and Nissan.[34] A 2013 HLDI study "found that thieves were sometimes targeting the older model years of a vehicle series without immobilizers, such as the Honda Civic and Honda Accord."[35]

63.    Despite decades of research and findings that immobilizers significantly reduced vehicle theft and the consequential public safety risks, "only 26 percent of Hyundai and Kia" 2015 vehicle models had "passive immobilizers as standard equipment, compared with 96 percent of other manufacturers."[36]

64.    The low percentage of Hyundai and Kia vehicles with immobilizers, or other reasonable anti-theft technology, is especially concerning given that, during

---

[33] *Hyundai and Kia theft losses*, 38 HLDI Bull. 28, 1 (Dec. 2021), https://www.iihs.org/media/0e14ba17-a3c2-4375-8e66-081df9101ed2/opm7QA/HLDI%20Research/Bulletins/hldi_bulletin_38-28.pdf.
[34] *Id.* at 2.
[35] *Id.*
[36] *Id.* at 5.

this same time period, Hyundai and Kia were installing immobilizers in their models for sale in the European and Canadian markets.[37]

65.    Defendants are familiar with the benefits of installing effective anti-theft devices in the American market. They acted with full knowledge that they were making choices that would result in their vehicles being more susceptible to theft.

66.    There are two separate components to NHTSA's vehicle theft regulations—one emphasizing the supply side of the market for stolen vehicles and the other the demand side. The supply-side regulation, 49 C.F.R. § 571.114, requires automobile manufacturers to include reasonable anti-theft technology, of which engine immobilizers are the industry standard, to make it harder for would-be thieves to steal cars.

67.    The demand-side regulation, 49 C.F.R. § 541, requires automobile manufacturers to label parts with unique identifiers to make it easier to identify parts that have been stolen from a vehicle and, thereby, reduce the demand for stolen cars and chop shops (where stolen cars are disassembled so that their valuable parts can be sold).[38] If a line of vehicles is adequately protected from theft due to the inclusion of anti-theft technology, manufacturers can apply for exemptions from this labeling

---

[37] Hyundai first began exporting its cars to parts of Europe, the United Kingdom, and Canada between 1978 and 1984. *See Over 50 years of progress: the history of Hyundai*, Hyundai Newsroom (Apr. 6, 2019), https://www.hyundai.news/eu/articles/press-releases/over-50-years-of-progress-the-history-of-hyundai.html. Similarly, Kia vehicles were introduced into European and Canadian markets in the 1990s.

[38] Requirements for passenger motor vehicles, 49 C.F.R. § 541.5 (June 1, 2011).

requirement. *See* 49 C.F.R. § 543. Hyundai requested an exemption from the labeling requirement for its 2008 Hyundai Azera line based on its inclusion of an immobilizer.[39]  Recognizing the efficacy of the anti-theft technology in March of 2007, "Hyundai stated that the data shows a dramatic reduction of theft rates due to the introduction of devices substantially similar to the Hyundai immobilizer device."[40]

68.    Despite knowing the unquestionable benefit of engine immobilizers, until the last year or so, Hyundai and Kia offered immobilizers only in a few of their more expensive models, like the Azera, and they failed to equip their other models with any reasonably effective alternative. Their decisions have compounded the harms to low-income communities.[41] Consumers without resources to afford these

---

[39] Petition for Exemption From the Vehicle Theft Prevention Standard; Hyundai-Kia America Technical Center, Inc., 72 Fed. Reg. 39,661 (July 19, 2007), https://www.govinfo.gov/content/pkg/FR-2007-07-19/pdf/FR-2007-07-19.pdf; *see also* Petition for Exemption From the Vehicle Theft Prevention Standard; Hyundai-Kia America Technical Center, Inc., 75 Fed. Reg. 1,447 (Jan. 11, 2010), https://www.govinfo.gov/content/pkg/FR-2010-01-11/pdf/2010-236.pdf (NHTSA notice granting an identical exemption for the Kia Amanti vehicle line beginning in model year 2009 based on Defendant Kia's representation that the immobilizer installation for that specific model should substantially reduce theft rates).

[40] *Id.* (Hyundai cited theft rates of other car makes because there was no available theft data for its Azera line at the time. But Hyundai told NHTSA its immobilizer was functionally and operationally similar to others and cited the efficacy of those devices, such as "the Taurus, Mustang, Riviera and Toronado vehicle lines[, which] showed a 63, 70, 80, and 58 percent theft rate reduction, respectively, between pre- and post-introduction of immobilizer devices as standard equipment on these vehicle lines.").

[41] Tom Krisher, *Thieves key on hack that leaves Hyundai, Kia cars vulnerable*, AP News (Sept. 21, 2022, 10:21 PM), https://apnews.com/article/social-media-milwaukee-theft-ecd3be407c1b7cb725ae607b8d86bcaf (noting that "[m]any of the vulnerable Hyundais and Kias are often bought by lower-income people"

higher end models are more likely to live in areas with higher crime rates and are likely less able to pay for alternative transportation or for the cost of repairing a recovered, but damaged, vehicle after a theft.

69.    In September 2022, HLDI found that Hyundais and Kias are stolen at nearly twice the rate of other vehicles in the automobile industry. Specifically, "Hyundais and Kias without immobilizers had a vehicle theft claim rate of 2.18 per 1,000 insured vehicle years" while the remainder of the industry, combined, had a theft claim rate of 1.21.[42]

70.    Defendants' decision not to install reasonable anti-theft technology in the Susceptible Vehicles between 2011 and 2022, in contrast to the vast majority of car manufacturers that did, has, foreseeably, led to the epidemic plaguing Plaintiff.

### C.    The Lack of Reasonable Anti-Theft Technology in Most Hyundai and Kia Vehicles Has Led to a Wave of Thefts

71.    Kia and Hyundai chose to flout the industry standard of utilizing an engine immobilizer or other reasonable anti-theft technology in the Susceptible Vehicles, which made those vehicles more susceptible to theft. As would-be car thieves learned of this susceptibility, the incidence of theft for Susceptible Vehicles increased, relative to other models, from 2015 to 2020.[43]

---

because, as stated by HLDI Senior VP Matt Moore, those cars "are relatively inexpensive vehicles when purchased new").

[42] *Id.* ("An insured vehicle year is equal to one vehicle insured for one year.").

[43] *See NICB's Hot Wheels: America's 10 Most Stolen Vehicles*, NICB (Aug. 1, 2016), https://www.nicb.org/sites/files/2017-11/2015-Hot-Wheels-Report.pdf; *NICB's Hot Wheels: America's 10 Most Stolen Vehicles*, NICB (July 12, 2017), https://www.nicb.org/sites/files/2017-11/2016-Hot-Wheels-Report.pdf; *2017 Hot Wheels Report*, NICB (Sept. 18, 2018), https://www.nicb.org/news/news-

72.    However, this progression became an explosion in late 2020, when a group of teenagers began posting "how-to" videos detailing how simple it was to steal Susceptible Vehicles.[44] That group, the "Kia Boyz," became notorious for posting videos of youth engaging in reckless driving after stealing Kias and Hyundais.[45] As the videos detailed, a thief need only break a window, remove the plastic cowl under the steering column, and use a USB connector (such as the ubiquitous mobile phone charging cable) to turn the ignition switch and start these unsecure cars. In many instances, thieves are able to break into the Susceptible Vehicles and drive away in under one minute.

73.    What followed the trending documentation of the unsecure Susceptible Vehicles was all too predictable: thefts of Kias and Hyundais skyrocketed.[46] In the

---

releases/2017-hot-wheels-report; *NICB's Hot Wheels: America's 10 Most Stolen Vehicles*, NICB (Nov. 19, 2019), https://www.nicb.org/sites/files/2020-01/2018%20Hot%20Wheels%20Report.pdf; *NICB's Hot Wheels:* America's Top Ten Most Stolen Vehicles, NICB (Oct. 13, 2020), https://www.nicb.org/HotWheels2019; and *NICB Releases Annual 'Hot Wheels' Report: America's Top Ten Most Stolen Vehicles*, NICB (Oct. 12, 2021), https://www.nicb.org/news/news-releases/nicb-releases-annual-hot-wheels-report-americas-top-ten-most-stolen-vehicles.

[44] Greg Rosalsky, *Someone stole my truck. I got a crash course on the wild black market for stolen cars*, NPR (Aug. 23, 2022, 6:30 AM), https://www.npr.org/sections/money/2022/08/23/1118457271/someone-stole-my-truck-i-got-a-crash-course-on-the-wild-black-market-for-stolen-.

[45] Chris DiLella & Andrea Day, *TikTok challenge spurs rise in thefts of Kia, Hyundai cars*, CNBC (Sept. 9, 2022, 9:11 PM), https://www.cnbc.com/2022/09/08/tiktok-challenge-spurs-rise-in-thefts-of-kia-hyundai-cars.html.

[46] *Videos Show Teens How to Steal Certain Kias and Hyundais With Only a USB Cable, Police Warn Amid Rising Thefts*, Inside Edition (Aug. 10, 2022, 1:51 PM), https://www.insideedition.com/videos-show-teens-how-to-steal-certain-kias-and-hyundais-with-only-a-usb-cable-police-warn-amid.

first half of 2021, the number of stolen Kias and Hyundais in Milwaukee increased by more than thirty and fifteen times, respectively, when compared to the same period in 2020.[47] This dramatic increase in thefts is unique to Kias and Hyundais, which represented 67% of all cars stolen in that period, compared to only 6% of stolen cars in 2019.[48] This trend then spread nationwide.

### D.    Car Thefts Imperil Public Safety

74.    Car thefts directly imperil public safety. By creating, facilitating, and/or otherwise contributing to a rash of car thefts, Defendants are responsible for a substantial risk to the public safety.

75.    NHTSA promulgated FMVSS 114 to reduce the instances of car theft, because "stolen cars constitute a major hazard to life and limb on the highways."[49] NHTSA concluded that the "evidence shows that cars operated by unauthorized persons are far more likely to cause unreasonable risk of accident, personal injury, and death than those which are driven by authorized individuals."[50] The NHTSA Administrator concluded that "a reduction in the incidence of auto theft would make a substantial contribution to motor vehicle safety," by reducing both injuries and

---

[47] Sean Tucker, *Milwaukee Police Report Hyundais, Kias Stolen in Record Numbers*, Kelley Blue Book (Dec. 14, 2021, 5:27 PM), https://www.kbb.com/car-news/milwaukee-police-report-hyundais-kias-stolen-in-record-numbers/.

[48] Matt Posky, *Summer of Theft Creating Bad Publicity for Hyundai, Kia*, Truth About Cars (Sept. 20, 2022, 2:36 PM), https://www.thetruthaboutcars.com/cars/kia/summer-of-theft-creating-bad-publicity-for-hyundai-kia-44496971.

[49] *See* Motor Vehicle Safety Standard No. 114; Theft Protection; Passenger Cars, 33 Fed. Reg. 6,471 (Apr. 27, 1968), https://www.govinfo.gov/content/pkg/FR-1968-04-27/pdf/FR-1968-04-27.pdf#page=1.

[50] *Id.*

25

deaths to would-be car thieves, and by "protect[ing] the many innocent members of the public who are killed and injured by stolen cars each year."[51]

76.    The reverse is true as well. An *increase* in the incidence of automobile theft results in a substantial decrease in public safety. Defendants' decision not to equip their vehicles with reasonable anti-theft technology, such as an immobilizer, has led to a clear rise in automobile thefts and the concomitant threats to public safety. Stolen cars are often driven recklessly—particularly in this case, where cars are stolen for joyriding or use in the commission of other crimes, rather than for parts or resale—which poses a risk to both the operators of the stolen vehicle and any lawful drivers or pedestrians who are unfortunate enough to cross their paths.

77.    By creating a rash of car thefts, Defendants are responsible for a substantial risk to public safety.

78.    Reckless driving impacts the comfortable enjoyment of life, health, and safety of others. Distinct from many instances of car theft, where the object is converting the stolen vehicle (either whole or in parts), the recent wave of Hyundai and Kia thefts often involves teenagers joyriding, posting videos of themselves driving recklessly, and then abandoning the stolen vehicles—often after collisions—at all hours of the day and night.

79.    Social media platforms are rife with examples of this dangerous conduct. Videos posted on these platforms highlight the very real dangers of this phenomenon, including youth joyriding through school zones or through crowds of

---

[51] *Id.*

bystanders, and drivers hitting other cars and then running from the scene.[52] The fact that many of the perpetrators are juveniles and therefore inexperienced drivers—in many cases, too young to have a driver's license or permit—adds to the danger.

80.    Police officers responding to vehicle thefts and other crimes stemming from those same thefts also face serious safety threats. In Cleveland, officers have been shot,[53] shot at,[54] and stabbed[55] when responding to and/or encountering a Hyundai or Kia theft incident. In Tonawanda, a police officer stopped a driver in a stolen Kia Sportage SUV and was dragged and "thrown onto the road" when the

---

[52] *See, e.g.*, @mixtapetrappers, Instagram (Oct. 19, 2021), https://www.instagram.com/p/CVNhjg9D64B/?utm%20medium=copy%20link; @monloww, TikTok (Oct. 10, 2022), https://www.tiktok.com/@monloww__/video/7153012228067773738; @414hypehouse, Instagram (Aug. 19, 2021), https://www.instagram.com/p/CSwsnhfAktd/; @414hypehouse, Instagram (Sept. 10, 2021), https://www.instagram.com/p/CTqCaYTANaC/; @414hypehouse, Instagram (Oct. 20, 2021), https://www.instagram.com/p/CVRCcU5AkwT/.

[53] Julia Bingel, *Cleveland police issue warrant for 17-year-old boy accused of shooting officer (body camera video)*, 19 News (Mar. 30, 2023, 8:51 AM), https://www.cleveland19.com/2023/03/30/cleveland-police-issue-warrant-17-year-old-male-accused-shooting-officer/.

[54] Ed Gallek & Peggy Gallek, *Thieves getting bolder: Police threatened, taunted, and shot by suspects in stolen KIAs*, Fox 8 (Mar. 20, 2023, 4:52 PM), https://fox8.com/news/i-team-thieves-getting-bolder-police-threatened-taunted-and-shot-by-suspects-in-stolen-kias/.

[55] Ed Gallek & Peggy Gallek, *Cleveland police officer stabbed in head with screwdriver*, Fox 8 (June 12, 2023, 2:12 PM), https://fox8.com/news/cleveland-police-officer-stabbed-in-head-with-screwdriver/; *see also* John H. Tucker, *Suspect charged in screwdriver assault on off-duty Cleveland police officer*, Cleveland.com (June 15, 2023, 4:34 PM), https://www.cleveland.com/crime/2023/06/suspect-charged-in-screwdriver-assault-on-off-duty-cleveland-police-officer.html.

driver of the stolen Kia attempted to flee.[56] The officer was badly injured and subsequently hospitalized.[57]

81.    A substantial risk to public safety also arises in the event that the would-be thief is confronted in the act. In January 2023, a Cleveland man followed a Hyundai Sonata that struck his car mirror and did not stop. The driver and passenger of the Hyundai got out of the vehicle with guns and began shooting at him.[58] Police found nine bullet casings in the street and bullet holes in the front window of a nearby home and in a car parked on the street.[59] About one hour later, the same Hyundai, which had been reported stolen days earlier, was involved in a drive-by shooting.[60]

82.    This risk was also tragically demonstrated in Columbus, Ohio, when a 4-year-old was killed in a hit-and-run involving a stolen Kia.[61]

---

[56] Stephen T. Watson, *Tonawanda officer badly injured when dragged by stolen vehicle is released from ECMC*, Buffalo News (June 5, 2023), https://buffalonews.com/news/local/crime-and-courts/tonawanda-officer-badly-injured-when-dragged-by-stolen-vehicle-is-released-from-ecmc/article_4768ae48-03d4-11ee-8593-4322704cd734.html#tracking-source=article-related-bottom.

[57] *Id.*

[58] Cory Shaffer, *Teens Lodge stolen Hyundai in Burger King drive-thru on two wheels after owner confronts them*, Cleveland.com (Feb. 3, 2023, 5:03 PM), https://www.cleveland.com/court-justice/2023/02/teens-lodge-stolen-hyundai-in-burger-king-drive-thru-on-two-wheels-after-owner-confronts-them.html.

[59] *Id.*

[60] *Id.*

[61] Carly D'Eon, *Man wanted in fatal hit-and-run of 4-year-old boy turns himself in*, 10 WBNS (July 24, 2023, 6:04 AM), https://www.10tv.com/article/news/local/arrest-warrant-issued-for-man-allegedly-connected-to-fatal-hit-skip-south-franklinton/530-a8ab887d-8c43-48ea-8b4d-91ed5531a351.

83.    Car thefts and reckless driving also create a substantial risk of physical harm to pedestrian bystanders. On February 8, 2023, a stolen Hyundai involved in a high-speed chase in Baltimore crashed into another car and a 54-year-old pedestrian.[62] Both cars careened into a nearby building, which collapsed on top of the vehicles and the pedestrian.[63] The pedestrian was pronounced dead at the scene, and five occupants of the two cars were injured.[64]



### E.    Car Thefts Drain Public Resources and Frustrate Public Policy

84.    Plaintiff has expended significant time and resources responding to this public nuisance.

---

[62] Dan Belson, *Footage shows fatal crash into Baltimore building, collapse following police pursuit of stolen car*, Balt. Sun (Mar. 2, 2023, 8:29 PM), https://www.baltimoresun.com/news/crime/bs-md-ci-cr-oag-crash-collapse-footage-20230303-rbd6j3tokfhkjduh3oktmo6ow4-story.html [https://perma.cc/6UHA-S9GT].

[63] *Id.*

[64] *Id.*

85.     Additionally, the police and emergency resources Plaintiff has been forced to divert to respond to these thefts leaves fewer resources for combatting other crimes and enhancing community safety.[65]

86.     As a result of the skyrocketing rates of theft of Hyundai and Kia vehicles nationwide, some insurance companies are refusing to write policies for certain Hyundai and Kia models in certain locales, thereby increasing the potential number of uninsured motorists on the road.[66]

---

[65] John Roman *et al.*, *Cost-Benefit Analysis for Crime Prevention: Opportunity Costs, Routine Savings and Crime Externalities*, 14 Crime Prevention Stud. 53–92 (Jan. 2002), https://www.researchgate.net/publication/28575336_Cost-Benefit_Analysis_for_Crime_Prevention_Opportunity_Costs_Routine_Savings_and_Crime_Externalities.

[66] Peter Valdes-Dapena, *Some auto insurers are refusing to cover certain Hyundai and Kia models*, CNN (Jan. 28, 2023, 3:06 PM), https://www.cnn.com/2023/01/27/business/progressive-state-farm-hyundai-kia/index.html; *see also* Robert Higgs, *Progressive, State Farm halt new car insurance policies for high theft models of Kia and Hyundai*, Cleveland.com (Jan. 31, 2023, 1:06 PM), https://www.cleveland.com/business/2023/01/progressive-state-farm-halt-new-car-insurance-policies-for-high-theft-models-of-kia-and-hyundai.html; *see also* Joe Hernandez, *Dealers still sell Hyundais and Kias vulnerable to theft, but insurance is hard to get*, NPR (May 4, 2023, 5:00 AM), https://www.npr.org/2023/05/04/1173048646/hyundai-kia-car-theft-tiktok-insurance-dealerships (discussing how "a dozen" insurance companies denied coverage for the new owner of 2020 Kia Forte).

## V.    THE CONTINUING PUBLIC NUISANCE AND DEFENDANTS' LATE, INSUFFICIENT RESPONSE

87.    The rampant thefts of Hyundai and Kia vehicles are still impacting municipalities and counties nationwide, including the City of Lorain, years after the rise in thefts of the Susceptible Vehicles first began.[67]

88.    Data from the Council on Criminal Justice shows that between 2019 and 2023 motor vehicle theft has increased an average of 104% across 30 cities in the United States.[68]

89.    Defendants' responses to the crises that they have created show they continue to prioritize profits over safety. Defendants have refused to implement a recall to install reasonable anti-theft technology in the Susceptible Vehicles, initially suggesting only that owners of Susceptible Vehicles use wheel locks and, for some government entities, offering wheel locks for them to distribute.[69] Unfortunately, the wheel locks are not entirely effective; Susceptible Vehicles with wheel locks in use have still been stolen and, in some instances, used in connection

---

[67] Tom Krisher, *Hyundai and Kia thefts keep rising despite security fix*, AP News (May 9, 2023, 7:40 AM), https://apnews.com/article/hyundai-kia-tiktok-theft-stolen-8e0a353d24be0e7bce36e34c5e4dac51.

[68] Ernesto Lopez *et al.*, *Crime Trends in U.S. Cities: Mid-Year 2023 Update*, Council Crim. Just. (July 2023), https://counciloncj.org/mid-year-2023-crime-trends/.

[69] Elliot Hughes, *Kia, Hyundai will make security feature standard on new vehicles and distribute free steering wheel locks after surge of thefts*, Milwaukee J. Sentinel (July 19, 2021, 10:16 AM), https://www.jsonline.com/story/news/crime/2021/07/19/kia-hyundai-handing-out-free-steering-wheel-locks-through-end-year/7963950002/.

with other crimes, including shootings.[70] In addition, government entities are not set up to distribute automotive parts to residents.

90.     More recently, Hyundai and Kia have begun rolling out a "software update" rather than installing immobilizers or other reasonable anti-theft technology.[71] As highlighted in the multistate letter sent on behalf of 18 Attorneys General, Hyundai acknowledged that some of the affected vehicles cannot be updated, and Kia "confirmed that some unspecified number of affected vehicles cannot receive the updates."[72]

---

[70] Ashley Sears, *Milwaukee woman's Kia stolen twice, had steering wheel lock*, FOX 6 News Milwaukee (Sept. 28, 2021), https://www.fox6now.com/news/milwaukee-womans-kia-stolen-twice; *see also* David Rose, *'B****, I swear, b****, I'm gonna crack your phone:' Drive-by shooting suspect says to Tacoma woman*, FOX 13 Seattle (Jan. 25, 2023), https://www.q13fox.com/news/b-i-swear-b-im-gonna-crack-your-phone-drive-by-shooting-suspect-says-to-tacoma-woman; and *Boy, 15, fighting for his life after shooting involving stolen Kia in Minneapolis*, CBS News Minnesota (Apr. 6, 2023), https://www.cbsnews.com/minnesota/video/boy-15-fighting-for-his-life-after-shooting-involving-stolen-kia-in-minneapolis/.

[71] *Hyundai and Kia Launch Service Campaign to Prevent Theft of Millions of Vehicles Targeted by Social Media Challenge*, NHTSA (Feb. 14, 2023), https://www.nhtsa.gov/press-releases/hyundai-kia-campaign-prevent-vehicle-theft.

[72] Letter from Attorneys General to Ann Carlson, Acting Administrator of the National Highway Traffic Safety Administration ("Letter from Attorneys General to NHTSA") at 6 (Apr. 20, 2023), https://oag.dc.gov/sites/default/files/2023-04/AG%20Multistate%20Letter%20to%20NHTSA%204.20.2023%20%281%29.pdf.

91.    As acknowledged in the motion for preliminary approval of the class action settlement in the instant litigation, only 6.9 million of the approximately *9 million* Susceptible Vehicles are even eligible for the update.[73]

92.    In the three months immediately following Kia's and Hyundai's release of the software update, data gathered from the Associated Press showed "that the number of Hyundai and Kia thefts is still growing[.]"[74] The software update has not stopped the nuisance that the Susceptible Vehicles created and the expenses that Plaintiff has incurred and continues to incur.

93.    The update's efficacy has not been proven in the real world. There have been numerous reports of Kia and Hyundai vehicles being stolen after receiving the software update, and Kia and Hyundai have identified scenarios where the software logic fails.[75] For vehicles not covered by the update, Defendants are

---

[73] Consumer Class Pls.' Notice Mot. & Renewed Mot. Prelim. Approval Class Action Settlement at 12, *In Re: Kia Hyundai Vehicle Theft Marketing, Sales Practices, and Products Liability Litigation*, 8:22-ml-03052-JVS-KES (C.D. Cal. Sept. 27, 2023), Dkt. No. 228; *see also* Carly Schaffner, *Kia, Hyundai anti-theft software fixes a work in progress*, Auto. News (June 2, 2023, 8:00 AM), https://www.autonews.com/regulation-safety/kia-hyundai-antitheft-software-fix-needs-fixes [https://perma.cc/HGH7-ZHZF] (noting that Defendants estimate "there are 9 million affected vehicles between them on the road").

[74] *See* Tom Krisher, *Hyundai and Kia thefts keep rising despite security fix*, AP News (May 9, 2023, 7:40 AM), https://apnews.com/article/hyundai-kia-tiktok-theft-stolen-8e0a353d24be0e7bce36e34c5e4dac51.

[75] Carly Shaffner, *Kia, Hyundai anti-theft software fixes a work in progress*, Auto. News (June 2, 2023, 8:00 AM), https://www.autonews.com/regulation-safety/kia-hyundai-antitheft-software-fix-needs-fixes [https://perma.cc/HGH7-ZHZF] (discussing a February 2023 service bulletin issued from Kia to its dealers regarding a software compatibility issue for Kia vehicles equipped with remote start accessories; another bulletin issued from Kia in late-May of 2023 acknowledged that "the problem has not been remedied").

offering nothing more than steering wheel locks or rebates for already purchased wheel locks.[76] As noted by multiple Attorneys General, steering wheel locks "still would not correct the underlying safety flaw . . . and . . . would impermissibly shift the responsibility for fixing this problem from the company to the individual vehicle owners."[77]

94.    In addition, upon information and belief, the software update can significantly inconvenience the drivers of the Susceptible Vehicles, making them less likely to seek it out and use it. Rather than install an actual immobilizer or other reasonable anti-theft technology, the software update merely doubles the length of the vehicles' theft alarm sound and adds a new logic check to the vehicles' onboard computers that is intended to prevent the Engine Control Unit from allowing the engine to start and run if the key fob is not used to unlock the doors. This update will interfere with the usability of the Susceptible Vehicles in many everyday situations, making drivers less likely to use it if they get the update at all.

95.    As noted by the Attorneys General in their letter dated April 20, 2023, there are at least two other significant issues with the software update. First, "not all eligible vehicles can receive the updates immediately"—approximately two million vehicles with the "starting system flaw" are still awaiting eligibility for the update.[78] Meanwhile, these vehicles "will remain on the road, vulnerable to theft

---

[76] *See* Zac Palmer, *Hyundai launches software update to fix some of 4 million vehicles at risk of theft*, Yahoo! (Feb. 14, 2023), https://autos.yahoo.com/hyundai-launches-software-fix-4-155800221.html.

[77] Letter from Attorneys General to NHTSA at 6.

[78] *Id.* at 6–7. Additionally, media outlets report that customers are "having a difficult time getting through" to customer service representatives for Hyundai

and posing a threat to public safety."[79] Second, Defendants' "voluntary service campaign" does not prompt certain "regulatory requirements and oversight and instead places additional burdens on individual vehicle owners."[80]

96.    Owners of the Susceptible Vehicles have already experienced issues where the software update—which requires the car to be unlocked using the fob before starting, or else the alarm will sound—conflicts with after-market remote start systems that they had installed, rendering the vehicles functionally inoperable. As one owner recently posted: "I have the update. I also have an aftermarket remote start. The remote start will set off my car alarm. You can turn the alarm off, but it will beep periodically and the headlights flash until you turn the vehicle off."[81]

97.    There can be no doubt that communities nationwide are suffering harmful downstream consequences because of business decisions Hyundai and Kia made not to include reasonable anti-theft technology, such as an engine immobilizer, in the Susceptible Vehicles. And as local governments have experienced nationwide when vaping products and drugs have unleashed

---

and Kia to inquire about the software update and their vehicle's eligibility. *See Hyundai, Kia owners frustrated by customer call center wait times to get security upgrade*, WHIO TV 7 (Feb. 16, 2023, 8:47 PM), https://www.whio.com/news/crime-and-law/hyundai-kia-owners-frustrated-by-customer-call-center-wait-times-get-security-update/SXRBN3OTHVC37OLC3735Y755ZU/.

[79] Letter from Attorneys General to NHTSA at 7.

[80] *Id.*

[81] u/fungiinterezt, *Hyundai and Kia release software update to prevent TikTok thefts*, Reddit (Feb. 15, 2023, 7:05 AM), https://www.reddit.com/r/kia/comments/11303m4/hyundai_and_kia_release_software_update_to/.

35

widespread harms affecting public health and safety, local communities are left paying the price for businesses' decisions to boost their profits.

98.    Prior to this software update, Hyundai turned this crisis of its own making into a source of revenue, selling security kits for $170, plus the cost of installation.[82] Defendants could have, and should have, initially included a fob-integrated engine immobilizer, or other reasonable anti-theft technology, consistent with the industry standard. According to the Netherlands Institute for Certification of Vehicle Security Systems, the additional manufacturing costs relating to installing adequate anti-theft devices in 2011 would have been at most €50 per car, approximately $70.[83] Even after the cars were sold, Defendants could have implemented a mandatory recall. Instead, Hyundai chose to make money from a crime wave it caused.

99.    Because Hyundai and Kia have not implemented a mandatory recall for the installation of immobilizers or other reasonable anti-theft technology,

---

[82] Taryn Phaneuf, *Own a Kia or Hyundai? Here's Why Your Insurance Rates Could Go Up*, Nerd Wallet (Jan. 26, 2023, 1:31 PM), https://www.nerdwallet.com/article/insurance/kia-hyundai-theft.

[83] Jan C. van Ours & Ben Vollaard, *The Engine Immobiliser: A Non-Starter for Car Thieves*, TILEC Discussion Paper No. 2013-001, SSRN (Jan. 14, 2013), https://deliverypdf.ssrn.com/delivery.php?ID=12708712009702911907808410708100103002204101703102707809909302410600907512711800203000112100512204212610702708709510002601807004603401306408807602206708511002001005806603809008501901710808903112706911108611312109603000102706909009000710608107803008&EXT=pdf&INDEX=TRUE.

36

millions of the Susceptible Vehicles remain on the road. The last report from CARFAX found that 4.9 million Hyundais and Kias remain susceptible to theft.[84]

100. By failing to equip their vehicles with reasonable anti-theft technology, such as an engine immobilizer, Defendants have elected profits over safety and created a public nuisance that continues to this day.

## VI.   IMPACTS ON THE CITY OF LORAIN

101. The City of Lorain has experienced increasing rates of Hyundai and Kia vehicle thefts. For all of 2023, the City of Lorain recorded approximately 66 thefts of Hyundai and Kia vehicles—a 633% increase from the 9 Hyundai and Kia thefts recorded for all of 2020.

102. The rise in Hyundai and Kia thefts in the City of Lorain noticeably increased in 2021 before reaching unprecedented heights in 2023. The 66 thefts of Hyundai and Kia vehicles in 2023 was more than double the total Hyundai and Kia thefts recorded for all of 2022 in the City of Lorain.

---

[84] Patrick Olsen, *Nearly 5 Million Hyundai and Kia Models Need Anti-Theft Repairs*, CARFAX Blog (July 19, 2023), https://www.carfax.com/blog/kia-hyundai-theft-repairs.



103.    In 2020 and 2021, Hyundai and Kias, combined, accounted for approximately 4.5% and 12%, respectively, of all vehicle thefts in the City of Lorain. For 2023, Hyundais and Kias accounted for approximately 37% of all motor vehicle thefts in the City of Lorain.

104.    Also, for 2023, the City of Lorain recorded 15 attempted thefts of Hyundai vehicles and 40 attempted thefts of Kia vehicles.

105.    The high rate of thefts has led to increased threats to public safety. For example, when responding to incidents involving stolen Hyundais and Kias, officers with the Lorain Police Department have observed the stolen vehicles reach speeds of 90 miles per hour as the drivers of the stolen vehicles run red lights and disobey traffic laws, which endangers officers and the residents of the City of Lorain.

106.    Stolen Hyundai and Kia vehicles have also been linked to attempted robberies of businesses, including gun stores, in the City of Lorain.

107.    The increased theft of these vehicles and the crimes committed with them caused the Lorain Police Department to dedicate additional resources to combat the crime wave, including a street crime unit to prevent and deter thefts of these vehicles and a detective to investigate crimes when these vehicles are stolen.

108.    In June of 2023, the Lorain Police Department arrested 9 people in connection with Kia and Hyundai car thefts—6 of whom were juveniles ranging in age from 13 to 17 years old.[85] Authorities stated that "the group was tied to roughly 50 attempted or successful vehicle thefts between May 6 and June 15" alone.[86]

109.    These juveniles and others involved thefts of these vehicles are more likely to commit crimes in the future. "[L]ongitudinal studies of delinquency and crime have repeatedly documented a strong link between past and future behavior."[87] "Across multiple data sources collected at different time periods and throughout the world, a consistent finding indicates that antisocial and deviant behavior that emerges early in the life course tends to continue into childhood,

---

[85] Tyler Carey, *Lorain police arrest 3 adults, 6 juveniles in connection with Kia, Hyundai car theft ring*, wkyc.com (June 19, 2023, 6:46 PM), https://www.wkyc.com/article/news/local/lorain-county/lorain-police-arrest-9-kia-hyundai-car-theft-ring/95-fd21ab08-e885-49bf-b771-ea6f1e1f71f5.

[86] *Id.*

[87] *See* Mark A. Cohen & Alex R. Piquero, *New Evidence on the Monetary Value of Saving a High Risk Youth*, 25(1) J. Quantitative Criminology 25–49 (2009), https://www.researchgate.net/publication/225637886_New_Evidence_on_the_Monetary_Value_of_Saving_a_High_Risk_Youth.

adolescence, and adulthood[.]"[88] The point, to put it bluntly, is that these Susceptible Vehicles can set juveniles down a path of crime.

## VII.   CAUSES OF ACTION
## COUNT ONE — COMMON LAW ABSOLUTE PUBLIC NUISANCE

110.   Plaintiff incorporates each preceding paragraph as though fully set forth herein.

111.   Defendants have a duty not to unreasonably, unlawfully, or significantly interfere with the common rights of the Ohio public, including those of the City of Lorain; these common rights include the right to be free from interference with their peace, comfort, convenience, health, welfare, and safety.

112.   Defendants breached this duty and therefore created and maintained a public nuisance.

113.   A "public nuisance" is an unreasonable interference with a right common to the general public, including the rights to public health and public safety.

114.   Defendants' conduct constitutes a public nuisance and, if unabated, will continue to threaten the safety, welfare, peace, comfort, and sense of security of the City of Lorain and its residents. *See* Restatement (Second) of Torts § 821B.

115.   Defendants, created, contributed to, and maintained a public nuisance when they intentionally, consciously, knowingly, and purposefully (a) designed, manufactured, marketed, sold, and distributed unsafe vehicles that were statistically more vulnerable to theft without an engine immobilizer or other reasonable anti-

---

[88] *Id.*

theft technology; (b) failed to prevent and/or created, incubated, and maintained the conditions necessary for a secondary market of unsafe and stolen vehicles;[89] and (c) failed to abate either one and pay compensation for the same despite their actual knowledge of the past, continuing, and future harm.

116.    Defendants' conduct has directly caused a severe disruption of public order and safety. The disruption created by Defendants' conduct is ongoing and continues to produce permanent and long-lasting damage.

117.    The public nuisance is an *absolute* public nuisance because Defendants' nuisance-creating conduct was intentional.

118.    Defendants knew that vehicle immobilizers are standard components in vehicles because of their effectiveness in reducing motor vehicle theft and corresponding impact on public safety. As alleged above, Defendants utilize vehicle immobilizers in their higher end models. Nonetheless, Defendants knowingly and intentionally decided not to use vehicle immobilizers or other reasonable anti-theft technology in the Susceptible Vehicles. Defendants are aware that their conduct has caused an increase in vehicle theft and thus has had, and will continue to have, a detrimental effect on the public welfare, safety, peace, comfort, and convenience of the City of Lorain and its residents.

119.    Defendants' conduct also substantially interferes with the public's right to safe and reasonable access to public thoroughfares. That conduct has

---

[89] *See Cincinnati v. Beretta U.S.A. Corp.*, 2002-Ohio-2480, ¶¶ 13–16, 95 Ohio St. 3d 416, 428, 768 N.E.2d 1136, 1149–50 (holding that the plaintiff had "adequately pled its public-nuisance claim," by alleging the defendants facilitate the flow of firearms into an illegal, secondary market).

contributed to the creation of unlawful obstructions and impediments to the flow of municipal transit vehicles and public traffic in the City of Lorain.

120. Defendants had control over the design and manufacture of the Susceptible Vehicles and their shipping of automobiles to the City of Lorain. Defendants continued to maintain control over the conduct through the ability, and failure, to provide the Susceptible Vehicles, initially or retroactively, with reasonable anti-theft technology.

121. It was reasonably foreseeable that Defendants' actions and omissions would result in the public nuisance and harm to the City of Lorain.

122. Defendants knew or had reason to know of the deterrent effects of reasonably effective anti-theft technology, such as engine immobilizers.

123. Despite their special position, Defendants intentionally and unreasonably chose not to equip the Susceptible Vehicles with reasonable anti-theft technology. If not for Defendants' intentional and unreasonable conduct, vehicle theft in the City of Lorain would not have become so widespread, and the enormous public safety issues that now exist would have been averted.

124. Defendants knew or had reason to know that their conduct would create a public nuisance. Defendants knew or had reason to know that their conduct was interfering with the public right to public safety and/or that their conduct was substantially certain to result in an increase in vehicle theft that would interfere with public safety.

125.   By failing to install reasonable anti-theft technology in the Susceptible Vehicles, Defendants directly facilitated the rapid increase in vehicle theft and, with it, the public nuisance affecting the City of Lorain.

126.   The public nuisance created by Defendants' actions is substantial and unreasonable. Defendants' actions have caused and continue to cause significant harms to the City of Lorain and its community. The harm inflicted outweighs any offsetting benefit.

127.   As a direct and proximate result of Defendants' conduct, Plaintiff has suffered and will continue to suffer economic damages, including significant expenditures for police, emergency, health, prosecutions, corrections, youth rehabilitative services, and other services.

128.   Defendants could have avoided all this by installing reasonable anti-theft technology at the time of manufacture.

129.   Defendants' conduct has affected and continues to affect the City of Lorain's community, and the City will continue to incur economic losses until the nuisance is abated.

130.   The nuisance created by Defendants' conduct is abatable.

131.   Defendants' misconduct alleged in this case does not concern a discrete event or discrete emergency of the sort for which a government would reasonably expect to provide services. The City of Lorain alleges an ongoing public nuisance resulting from Defendants' intentional conduct and requiring ongoing services and resources beyond what a government would reasonably expect to provide.

132.    The City of Lorain has incurred expenditures for special programs over and above its ordinary public services.

133.    The City of Lorain has suffered, and will continue to suffer, unique harms as described above, which are different in kind and degree to the harms suffered by Ohio citizens at large. These are harms that can only be suffered by Plaintiff.

134.    Plaintiff requests an order providing for abatement of the public nuisance that Defendants have created or assisted in the creation of; for compensation for the economic loss suffered as a result of that nuisance; and injunctive relief. The City of Lorain does not seek damages for death, physical injury to person, emotional distress, or physical damage to property.

**COUNT TWO — COMMON LAW QUALIFIED PUBLIC NUISANCE**

135.    Plaintiff incorporates each preceding paragraph as though fully set forth herein.

136.    Reasonably prudent automobile manufacturers in the same position as Defendants have a duty not to unreasonably, unlawfully, or significantly interfere with the common rights of the Ohio public, including those of Plaintiff; these common rights include the right to be free from interference with their peace, comfort, convenience, health, welfare, and safety.

137.    Defendants breached this duty and therefore created and maintained a public nuisance.

138.    Defendants have created, contributed to, and maintained a public nuisance by (a) designing, manufacturing, selling, and distributing unsafe vehicles

that were statistically more vulnerable to theft without an engine immobilizer or other reasonable anti-theft technology; (b) failing to prevent and/or creating, incubating, and maintaining the conditions necessary for a secondary market of unsafe and stolen vehicles;[90] and (c) failing to abate either one and paying compensation for the same despite their actual knowledge of the past, continuing, and future harm.

139.   Defendants' conduct also substantially interferes with the public's right to safe and reasonable access to public thoroughfares. That conduct has contributed to the creation of unlawful obstructions and impediments to the flow of municipal transit vehicles and public traffic in the City of Lorain.

140.   The City of Lorain and its residents have a common right to be free from such conduct and to be free from conduct that creates a disturbance and reasonable apprehension of danger to person and property.

141.   The public nuisance is a *qualified* public nuisance because Defendants negligently engaged in conduct or omissions which endanger or injure the health, safety, or comfort of the public in the City of Lorain.

142.   Defendants had a duty to exercise ordinary care and/or reasonable care in the design, research, development, manufacture, testing, and distribution of their vehicles into the stream of commerce, including a duty to exercise care to assure that the vehicles were safe and equipped with reasonable anti-theft technology.

143.   At all times relevant to this litigation, Defendants knew or, in the exercise of reasonable care, should have known of the hazards and dangers of

---

[90] *Id.*

failing to install reasonable anti-theft technology in the Susceptible Vehicles and specifically, the increased risk of vehicle theft and public harm.

144.    Defendants knew or reasonably should have known that a secondary market could exist, and did exist, for unsafe and stolen vehicles.

145.    It was also foreseeable that local governments, like the City of Lorain, would bear the burden for combating the theft of the vehicles and the existence and effects of that newly created market of unsafe and stolen vehicles.

146.    Accordingly, at all times relevant to this litigation, Defendants knew or, in the exercise of reasonable care, should have known that the omission of reasonable anti-theft technology in the Susceptible Vehicles could cause the City of Lorain's injuries and thus create a dangerous and unreasonable risk of injury to the City.

147.    As such, Defendants, by action and inaction, representation and omission, breached their duty and failed to exercise reasonable care, and failed to act as a reasonably prudent person and/or company would act under the same circumstances in the design, research, development, manufacture, testing, and distribution of their vehicles, in that Defendants manufactured and produced vehicles that fell below the standard for reasonable anti-theft measures.

148.    The public nuisance created by Defendants' actions is substantial and unreasonable. Defendants' actions have caused and continue to cause significant harms to Plaintiff and its community. The harm inflicted outweighs any offsetting benefit.

149.   As a direct and proximate result of Defendants' conduct, Plaintiff has suffered and will continue to suffer economic damages, including significant expenditures for police, emergency, health, prosecutions, corrections, youth rehabilitative services, and other services.

150.   Defendants could have avoided this by installing reasonable anti-theft technology at the time of manufacture.

151.   Defendants' conduct has affected and continues to affect Plaintiff's community, and Plaintiff will continue to incur economic losses until the nuisance is abated.

152.   The nuisance created by Defendants' conduct is abatable.

153.   Defendants' misconduct alleged in this case does not concern a discrete event or discrete emergency of the sort for which a government would reasonably expect to provide services. The City of Lorain alleges an ongoing public nuisance resulting from Defendants' conduct and requiring ongoing services and resources beyond what a government would reasonably expect to provide.

154.   The City of Lorain has incurred expenditures for special programs over and above its ordinary public services.

155.   The City of Lorain has suffered, and will continue to suffer, unique harms as described above, which are different in kind and degree to the harms suffered by Ohio citizens at large. These are harms that can only be suffered by Plaintiff.

156.   Plaintiff requests an order providing for abatement of the public nuisance that Defendants have created or assisted in the creation of; for

47

compensation for the economic loss suffered as a result of that nuisance; and injunctive relief. Plaintiff does not seek damages for death, physical injury to person, emotional distress, or physical damage to property.

### COUNT THREE — NEGLIGENCE

157.   Plaintiff incorporates each preceding paragraph as though set forth fully herein.

158.   At all times relevant to this litigation, Defendants had a duty to act as a reasonably careful person would act under the circumstances in the design, research, development, manufacture, testing and distribution of Defendants' products.

159.   Additionally, at all times relevant to this litigation, Defendants had a duty to take all reasonable steps necessary to prevent (a) the design, manufacture, distribution, and/or sale of a product that was so easy to steal and (b) the creation, incubation, or maintenance of the conditions necessary for a secondary market of unsafe and stolen vehicles.[91]

160.   Defendants owed and continue to owe Plaintiff a duty not to expose Plaintiff to an unreasonable risk of harm.

161.   Defendants' duties were preexisting.

162.   At all times relevant to this litigation, Defendants knew or, in the exercise of reasonable care, should have known of the hazards and dangers of

---

[91] *Id.*; *see also In re Nat'l Prescription Opiate Litig.*, No. 1:17-MD-2804, 2018 WL 6628898, at *19 (N.D. Ohio Dec. 19, 2018) (holding that opioid manufacturers owed local governments a duty not to create foreseeable secondary markets for opioids).

forging the installation of reasonable anti-theft technology, such as an engine immobilizer technology, in the Susceptible Vehicles and specifically, the increased risk of vehicle theft and public harm.

163.   Defendants knew or reasonably should have known that their vehicles were statistically more vulnerable to theft without reasonable anti-theft technology, the natural and probable consequence would be increased thefts (including formerly unsuccessful attempts that would now become successful), and that a secondary market would exist, and now does exist, for unsafe and stolen vehicles.

164.   It was also reasonably foreseeable that local governments, like the City of Lorain, would bear the cost for dealing with vehicle theft and the effects of a market of unsafe and stolen vehicles.

165.   Accordingly, at all times relevant to this litigation, Defendants knew or, in the exercise of reasonable care, should have known that the omission of reasonable anti-theft technology, such as an engine immobilizer, in the Susceptible Vehicles could cause Plaintiff's injuries and thus created a dangerous and unreasonable risk of injury to the City of Lorain. Defendants were therefore in the best position to protect the City of Lorain against the foreseeable rise in the theft of the Susceptible Vehicles.

166.   Defendants, by action and inaction, breached their duty and failed to exercise reasonable care, and failed to act as a reasonably prudent person and/or company would act under the same circumstances in the design, research, development, manufacture, testing, and distribution of their vehicles, in that

49

Defendants designed, manufactured, and produced vehicles that fell below the standards for reasonable anti-theft measures.

167.    Defendants are in control of the design, research, manufacture, testing, and distribution of the vehicles they distributed to authorized dealerships in the City of Lorain.

168.    Defendants knew and/or should have known that it was foreseeable that Plaintiff would suffer injuries as a result of Defendants' failure to exercise reasonable care in the manufacturing of Defendants' vehicles, particularly given Defendants' recognition as early as 2007 that engine immobilizers were an effective deterrent in preventing vehicle theft.

169.    Defendants were negligent in failing to monitor and guard against third-party misconduct and enabled such misconduct.

170.    Defendants acted unreasonably in light of the foreseeable result of their conduct, and Defendants' negligence helped to and did produce, and was a factual and proximate cause, of the injuries, harm, and economic losses that Plaintiff suffered and will continue to suffer.

171.    Defendants' acts and omissions imposed an unreasonable risk of harm to others separately and/or combined with the negligent and/or criminal acts of third parties.

172.    Plaintiff's injuries, harms, and economic losses would not have occurred absent Defendants' negligent conduct as described herein.

173.    As a proximate result of Defendants' wrongful acts and omissions, Plaintiff has been injured and suffered economic damages and will continue to incur

expenses in the future, as described herein, including but not limited to expending, diverting, and increasing resources to retrieve stolen cars, provide emergency medical services within the City of Lorain.

174.   Defendants engaged in conduct, as described above, that constituted reckless disregard of the safety and health of Plaintiff's residents, being fully aware of the probable dangerous consequences of the conduct and deliberately failing to avoid those consequences.

175.   The conduct constituting reckless and conscious disregard for public safety was committed and/or authorized by one or more officers, directors, or managing agents of Defendants, who acted on behalf of Defendants. Additionally, or in the alternative, one or more officers, directors or managing agents of Defendants knew of the conduct constituting reckless disregard for public safety and adopted or approved that conduct after it occurred.

176.   The misconduct alleged in this case does not concern a discrete event or discrete emergency of the sort a political subdivision would reasonably expect to occur and is not part of the normal and expected costs of a local government's existence. The City of Lorain alleges wrongful acts which are neither discrete nor of the sort a local government can reasonably expect to occur.

177.   The City of Lorain has incurred, and will continue to incur, expenditures over and above its ordinary public services due to the negligence caused by Defendants' actions.

178.   The tortious conduct of each Defendant was a substantial factor in producing harm to Plaintiff.

179. Defendants' conduct was not only negligent, but also willful, knowing, and reckless, constituting reckless disregard of Plaintiff's rights, including the rights of Plaintiff's citizens to public safety, and therefore warrants an award of aggravated or punitive damages.

180. Plaintiff is without fault and injuries to Plaintiff and its residents would not have occurred in the ordinary course of events had Defendants used due care commensurate to the dangers involved in the design, research, development, manufacturing, testing, and distribution of their vehicles.

181. Plaintiff asserts this Cause of Action as a common law tort claim for negligence and not as a "product liability claim" as defined in R.C. § 2307.71. Plaintiff does not seek damages for death, physical injury to person, emotional distress, or physical damage to property, as defined under the Ohio Product Liability Act.

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for a judgment:

182. Entering an Order that the conduct alleged herein constitutes a public nuisance under Ohio law;

183. Entering an Order that Defendants are jointly and severally liable;

184. Entering an Order requiring Defendants to abate the public nuisance described herein and to deter and/or prevent the resumption of such nuisance;

185. Enjoining Defendants from engaging in further actions causing or contributing to the public nuisance as described herein;

186.   Awarding Plaintiff equitable relief to fund automobile theft prevention;

187.   Awarding Plaintiff actual and compensatory damages;

188.   Awarding Plaintiff punitive damages;

189.   Awarding Plaintiff reasonable attorneys' fees and costs of suit;

190.   Awarding pre-judgment and post-judgment interest; and

191.   Awarding Plaintiff with such other and further relief as the Court deems just and proper under the circumstances.

## IX.    DEMAND FOR JURY TRIAL

192.   Plaintiff hereby demands a trial by jury.


RESPECTFULLY SUBMITTED this 3RD DAY OF MAY, 2024.

CITY OF LORAIN                               KELLER ROHRBACK L.L.P.

By */s/ Patrick D. Riley*                    By */s/ Gretchen Freeman Cappio*
Patrick D. Riley                             Gretchen Freeman Cappio (*pro
(*pro hac vice forthcoming*)                 hac vice*)
Law Director                                 Derek W. Loeser (*pro hac vice*)
Department of Law                            Ryan McDevitt (*pro hac vice*)
200 W Erie Avenue, 3rd Floor                 Alison Gaffney (*pro hac vice*)
Lorain, OH 44052                             Garrett Heilman (*pro hac vice*)
Telephone: (440) 204-2250                    Zachary Gussin (*pro hac vice*)
Fax: (440) 204-2257                          Kylie Fisher (*pro hac vice*)
Patrick_Riley@cityoflorain.org               1201 Third Avenue, Suite 3200
                                             Seattle, WA 98101-3052
                                             Telephone: (206) 623-1900
                                             Fax: (206) 623-3384
                                             gcappio@kellerrohrback.com
                                             dloeser@kellerrohrback.com
                                             rmcdevitt@kellerrohrback.com
                                             agaffney@kellerrohrback.com

53

gheilman@kellerrohrback.com
zgussin@kellerrohrback.com
kfisher@kellerrohrback.com

*Counsel for Plaintiff City of Lorain, Ohio*